Michelle GRAHAM, an Infant Under the Age of Eighteen, Who Sues by Her Parents, Guardians and Next Friends, Charles GRAHAM and Tammy Graham; and Charles Graham and Tammy Graham, Individually, Plaintiff,

v.

WYETH LABORATORIES, A DIVISION OF AMERICAN HOME PRODUCTS CORPORATION, a Pennsylvania Corporation, Defendant.

No. 85–1481–K.

United States District Court,
D. Kansas.

July 21, 1987.
Order Nunc Pro Tunc July 22, 1987.

Andrew Hutton, Michaud, Hutton & Michaud, Wichita, Kan., for plaintiff.

Albert J. Knopp, Baker & Hostetler, Cleveland, Ohio, Alvin D. Herrington, Wichita, Kan., Hedy M. Powell, Philadelphia, Pa., for defendant.

MEMORANDUM AND ORDER

PATRICK F. KELLY, District Judge.

This case is before the court on defendant's motion for summary judgment. Plaintiffs Charles and Tammy Graham claim their infant daughter, Michelle Graham, sustained severe and irreversible brain damage after being vaccinated against diptheria, pertussis (whooping cough) and tetanus. The DPT vaccine she received was manufactured and distributed by defendant Wyeth Laboratories ("Wyeth").

The plaintiffs, parents and daughter, brought this diversity action asserting claims of strict liability and negligence for design defect and failure to warn, breach of the implied warranties of merchantability and fitness for a particular purpose, and intentional misrepresentation. Plaintiffs also seek punitive damages, claiming the defendant willfully, wantonly and recklessly failed to adequately warn of the possible severe reactions to the DPT vaccine and willfully failed to rectify the product's design.

Defendant has moved for summary judgment, contending that federal law preempts plaintiffs' claims in their entirety. Alternatively, defendant contends that under Kansas laws as set forth in *Johnson v. American Cyanamid*, 239 Kan. 279, 718 P.2d 1318 (1986), this court must find as a matter of law that DPT vaccine is an "unavoidably unsafe" prescription drug which contains an adequate warning, and enter judgment in defendant's behalf.

After considering all well-pleaded facts in plaintiffs' favor, the court is convinced that defendant is not entitled to summary judgment and this case must proceed to trial. As will be explained herein, the court finds Congress did not intend to preempt state tort claims asserted by a victim of an adverse reaction to an FDA-approved drug. Further, the court finds that *Johnson* is distinguishable from the case at bar and does not require the entry of judgment in defendant's behalf.

## FACTS

Defendant Wyeth manufactures the DPT vaccine which is used to immunize children against the diseases of diptheria, pertussis (whooping cough) and tetanus (lockjaw). The vaccine is administered to infants at two, four, six and eighteen months. A booster is administered prior to the child's entrance into school.

The DPT vaccine is comprised of three component parts which will be more thoroughly described herein. Those components are diptheria toxoids, tetanus toxoids, and a pertussis whole cell vaccine. It is the pertussis component which causes severe reactions such as suffered by Michelle Graham.

While plaintiffs contend the pertussis component of the vaccine could have been safer, they do not argue that a pertussis vaccine is unnecessary or that it has not saved millions of lives. In the early 1900s, pertussis was a leading cause of death in children in this country.

In 1934, when this country suffered its worst pertussis epidemic, there were 265,000 reported cases of pertussis per year, and 7500 related deaths. Hinman and Koplan, *Pertussis and Pertussis Vaccine: Re Analysis of Benefits, Risks and Costs*, Journal of the American Medical Association (June 15, 1984). By the early 1940s, pertussis was responsible for two and one-half times the number of deaths as all of the following diseases combined: measles, mumps, rubella, diptheria, polio, meningitis, chicken pox, and scarlet fever. *Id.*

*Hurley v. Lederle Lab., Div. of American Cyanamid*, 651 F.Supp. 993, 995 (E.D.Tex. 1986). The DPT vaccine containing the "whole cell" pertussis vaccine was licensed by the FDA in 1949. Due to the widespead use of the vaccine in this country, pertussis has virtually been eradicated. However, because of the persistent nature of the pertussis bacteria, there is a continuing and substantial risk of epidemics if the use of the vaccine were to decline significantly. *Hurley*, 651 F.Supp. at 995.

The nature of the DPT vaccine and its component parts was recently capsuled by the Ninth Circuit, and is instructive herein:

By introducing an antigenic factor into the body, vaccines stimulate the production of antibodies that protect against disease. Some infectious organisms, such as those causing diptheria and tetanus, excrete soluble toxins insoluble by medical research. The toxin is inactivated with formaldehyde and transformed into a toxoid. The toxoid is then used in a vaccine, as it can immunize against disease by stimulating the production of antibodies in the recipient, even though it has lost its own poisonous qualities.

This is not the case, however, with [the Pertussis component]. The [Pertussis] vaccine is a so-called whole cell vaccine because it contains whole killed pertussis organisms. The whole organism is used because the pertussis organism contains fifteen or sixteen different antigens, and medical science has yet to isolate the one that stimulates protection against the disease. See *Tinnerholm v. Parke, Davis & Co.*, 411 F.2d 48, 50 (2d Cir. 1969).

*Toner for Toner v. Lederle Laboratories*, 779 F.2d 1429, 1430 (9th Cir.1986). Because the whole cell vaccine retains its poisonous qualities, it is "neurotoxic" and can cause adverse reactions which may be mild (local), or severe. Mild reactions may include swelling, fever, irritability, and crying spells. Severe reactions include encephalopathy, paralysis and death. The expected rate of such reactions is controverted by the parties. Defendant claims about one out of every 7,000 children will suffer high fever or convulsions while one of every 100,000 children will suffer brain damage; plaintiffs claim these figures are inac-

curate as to the Wyeth vaccine because they are based on faulty data. Plaintiffs further contend that Wyeth is aware that the incidence of severe reactions is actually much higher.

In recognition of the dangerous propensities of the whole cell vaccine, efforts have been made to develop a fractionated cell pertussis vaccine. During the 1950s, the Eli Lilly Company developed a "split cell" vaccine called Tri-Solgen. Early studies indicated this vaccine was less toxic than the whole cell and it was approved by the FDA in 1967. At that time, Lilly occupied a substantial share of the DPT market. In 1975, Lilly withdrew from the vaccine business and sold its Tri-Solgen vaccine to Wyeth. According to plaintiffs, in an effort to save on cost, Wyeth substituted its own "ingredients" (or "strains") into the Lilly "recipe" for the split cell vaccine. Wyeth then attempted to license this vaccine, but no license was granted by the FDA. Wyeth has made no further attempts to license a fractionated cell vaccine. Moreover, no such vaccine is licensed in this country today.[1] Of course, a pharmaceutical company is prohibited from marketing a product absent a license—to do so would constitute a criminal offense.[2] 21 U.S.C. §§ 331(d), 333(a), 355(a); *see also Toner v. Lederle*, 779 F.2d at 1431; *but see* 21 CFR 620.1 (allowing for manufacture of "either killed *whole* Bordetella pertussis bacteria or a *fraction* of Bordetella pertussis bacteria." [emphasis added]).

On March 17, 1980, plaintiff Michelle Graham, who was only a few months old, was administered defendant's DPT vaccine by a nurse at a county office of the Missouri Department of Health. Shortly thereafter Michelle developed a severe and irreversible neurological condition known

---

**1.** Japan has developed and is currently using a pertussis toxoid (i.e., acellular) vaccine. Japan's vaccine is purported to be as efficacious as the whole cell vaccine, but far less reactive. Lederle Laboratories is currently attempting to negotiate for, or duplicate, the Japanese vaccine. *See Toner*, 779 F.2d at 1431.

**2.** "[T]he fact that a fractionated cell vaccine is not now licensed does not mean it is disapproved—it merely means either that no manu-

facturer has sought and obtained approval or that, in the instance of the 1972 refusal [of Wyeth's split-cell vaccine] by a review panel of the Bureau of Biologics, the application therein failed to make an adequate showing of safety or efficacy which is not to say that another manufacturer could not have made a successful application." *Toner v. Lederle Laboratories*, 112 Idaho 328, 732 P.2d 297, 313 (1987) (Huntley, J., concurring).

as encephalopathy. For the purposes of this motion, the court will assume the plaintiff's condition was caused by the pertussis vaccine.

Wyeth furnished medical practitioners who purchased the vaccine with pamphlets describing contra-indications and possible adverse reactions to the drug's use. The pamphlet in use at the time of Michelle Graham's immunization stated, in pertinent part:

The below-listed serious, and occasionally fatal, adverse reactions *have been reported* following administration of pertussis-vaccine-containing preparations. The incidence of these reactions is unknown, but they seem to be exceedingly rare ...:

1. Severe temperature elevations—105°F. or higher.
2. Collapse with rapid recovery.
3. Collapse followed by prolonged prostration and a shock-like state.
4. Screaming episodes characterized by a prolonged period of peculiar crying during which the infant cannot be comforted.
5. Isolated convulsion(s) with or without fever.
6. Frank encephalopathy with changes in the level of consciousness, focal neurological signs, and convulsions with or without permanent neurological and/or mental deficit.
7. Thrombocytopenic purpura.

The occurrence of sudden-infant-death syndrome (SIDS) *has been reported* following administration of DTP. *The significance of these reports is unclear.* It should be kept in mind that the three primary immunizing doses of DTP are usually administered to infants between the age of 2 and 6 months and that approximately 85 percent of SIDS cases occur in the period 1 through 6 months of age....

....

Occurrence of any of the following signs, symptoms, or conditions following administration is a contraindication to further use of this product and/or pertussis vaccine as the single antigen: fever over 103°F (39°C); convulsion(s) with or without accompanying fever; alterations of consciousness; focal neurological signs; screaming episodes (also call screaming fits); collapse; thrombocytopenic purpura.

The presence of an evolving or changing neurologic disorder is a contraindication to use.

(Emphasis added.) The pamphlet also contained a section entitled "Precautions"; Wyeth's precautions did not advise the doctor to determine the child's personal or family history of central nervous system disease or convulsions. Nor was the doctor advised as to treating adverse reactions.

Prior to the administration of the vaccine to Michelle Graham, Mrs. Graham was given some materials to read about the vaccine and was asked to sign a consent form. The information was prepared by the Missouri Department of Health and discussed the possible "side effects" from the vaccine, stating: "Rarely, about once in every 100,000 shots, inflammation of the brain (encephalitis) or brain damage may occur. Death may occur, even more rarely." The form warned that some children should not take the vaccine without consulting a doctor, including "[t]hose who have had convulsions or other problems of the nervous system," and "[t]hose who have had serious reactions to DTP shots before." The form invited the parent to ask questions prior to signing.

Mrs. Graham did have questions about the possibility of side effects. The nurse told her that the figures were "just statistics" and that "[i]t didn't really happen." When Mrs. Graham asked the nurse what would happen if she decided against having Michelle immunized, she was told that the state would have her immunized and would then place her in a foster home. Mrs. Graham agreed to the vaccine because she thought she had no choice.

As a result of Michelle Graham's severe and permanent injuries, plaintiffs filed suit in this court seeking compensation from Wyeth Labs. The thrust of plaintiffs' claims against Wyeth is that Wyeth has the technical know-how to develop (or design) a

safer, yet equally efficacious, fractionated cell pertussis vaccine, but has refused to do so due to the increased manufacturing costs. Plaintiffs further assert that Wyeth has the technical ability to quantify the endotoxin level of each "batch" of vaccine produced, but has failed to do so. In this regard, plaintiffs contend the degree of endotoxin varies from vial to vial and lot to lot. Plaintiffs assert that Wyeth knew the reported risk factors of the whole cell vaccine were inaccurate and that the incidence of adverse reactions was actually much greater. Plaintiffs assert defendant had a duty to accurately disclose to the medical practitioner the inherent hazards of DPT, the contraindication to administering the vaccine, the alternatives to the whole cell vaccine, the likely results of refusing the vaccine, the antidotes to and treatment for adverse reactions to the vaccine, and early warning signs of an adverse reaction. Plaintiffs further assert Wyeth should have warned the medical practitioner to take a family history of the patient prior to administering the vaccine. As previously stated, plaintiffs proceed on theories of strict liability and negligence for design defect and failure to warn, breach of implied warranties, and intentional misrepresentation.

In ruling on a motion for summary judgment, the trial court conducts a threshold inquiry of the need for trial and grants summary judgment where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, ——, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202, 213 (1986). The court is to be concerned with the sufficiency of the evidence, not its weight. *Casper v. C.I.R.*, 805 F.2d 902, 904 (10th Cir.1986). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at ——, 106 S.Ct. at 2512, 91 L.Ed.2d at 214. There is no genuine issue for trial unless there is sufficient evidence—significantly probative or more than merely colorable— favoring the nonmoving party for a jury to

return a verdict for that party. 477 U.S. at ——, 106 S.Ct. at 2511, 91 L.Ed.2d at 212. Where there is but one reasonable conclusion as to the verdict and reasonable minds would not differ as to the import of the evidence, summary judgment is appropriate. 477 U.S. at ——, 106 S.Ct. at 2511, 91 L.Ed.2d at 213.

The movant's burden under Fed.R.Civ.P. 56 is to make an initial showing of the absence of evidence to support the nonmoving party's case. *Windon Third Oil and Gas v. Federal Deposit Ins.*, 805 F.2d 342, 345 (10th Cir.1986). To show an absence of material fact, the movant must specify those portions of "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits if any." Fed.R.Civ.P. 56(c). "[C]onclusory assertions to aver the absence of evidence remain insufficient to meet this burden." *Windon*, 805 F.2d at 345 n. 7. The opposing party may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts supported by the kinds of evidentiary pleadings listed in 56(c) which demonstrate a genuine issue remaining for trial. *Anderson*, 477 U.S. at ——, 106 S.Ct. at 2511, 81 L.Ed.2d at 213. The evidence of the nonmoving party is deemed true and all reasonable inferences are drawn in his favor. *Windon*, 805 F.2d at 346.

### I. The Preemption Doctrine

The doctrine of federal preemption arises from the Supremacy Clause of the United States Constitution:

> The Constitution and the laws of the United States which shall be made in pursuance thereof ... shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the laws of any state to the contrary notwithstanding.

U.S. Const., Art. VI, cl. 2.

Federal law may preempt state law in any of three ways:

> First, in enacting the federal law, Congress may explicitly define the extent to which it intends to pre-empt state law. E.g., *Shaw v. Delta Air Lines, Inc.*, 463

U.S. 85, 95–96, 77 L.Ed.2d 490, 103 S.Ct. 2890 [2898–99] (1983). Second, even in the absence of express pre-emptive language, Congress may indicate an intent to occupy an entire field of regulation, in which case the States must leave all regulatory activity in that area to the Federal Government. E.g., *Fidelity Federal Savings & Loan Assn. v. De la Cuesta,* 458 U.S. 141, 153, 73 L.Ed.2d 664, 102 S.Ct. 3014 [3022] (1982); *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 91 L.Ed. 1447, 67 S.Ct. 1146 [1152] (1947). Finally, if Congress has not displaced state regulation entirely, it may nonetheless pre-empt state law to the extent that the state law actually conflicts with federal law. Such a conflict actually arises when compliance with both state and federal law is impossible, *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–143, 10 L.Ed.2d 248, 83 S.Ct. 1210 [1217] (1963), or when the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz,* 312 U.S. 52, 67, 85 L.Ed. 581, 61 S.Ct. 399 [404] (1941). See also *Fidelity Federal Savings & Loan Assn,* supra, [458 U.S.] at 153, 73 L.Ed.2d 669, 102 S.Ct. [at 1222] 3014.

*Michigan Canners and Freezers Assoc. v. Agricultural Marketing and Bargaining Board,* 467 U.S. 461, 469, 104 S.Ct. 2518, 2523, 81 L.Ed.2d 399 (1984).

Congressional intent to occupy a field may be either express or implied. *Hurley,* 651 F.Supp. at 997. Congress may evidence its intent to occupy a field expressly by words in the statute itself, or in the statute's legislative history. *Silkwood v. Kerr-McGee,* 464 U.S. 238, 249–50, 104 S.Ct. 615, 621–22, 78 L.Ed.2d 443 (1984). In the absence of express preemption, there is a strong presumption that Congress did not intend to displace state law. *Maryland v. Louisiana,* 451 U.S. 725, 726, 101 S.Ct. 2114, 2118, 68 L.Ed.2d 576 (1981); *Palmer v. Liggett Group,* 633 F.Supp. at 1173; *see also Silkwood,* 464 U.S. at 251, 104 S.Ct. at 623. ("[The legislature's] silence takes on added significance in light of Congress' failure to provide any federal remedy for persons injured.... It is difficult to believe that Congress would, without comment, remove all means of judicial recourse for those injured....") However, certain factors may exist in narrow instances from which courts will infer that Congress intended to preempt state law in a particular field. For instance, the scheme of the regulation may be so pervasive that courts will infer a congressional intent to occupy the field. *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). Or, the nature of the subject matter may be one which demands exclusive federal regulation in order to achieve national uniformity and courts will assume the federal law precludes enforcement of state laws on the same subject. *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 143–44, 83 S.Ct. 1210, 1217–18, 10 L.Ed.2d 248 (1963). Or, finally, courts may determine that enforcement of state law in a particular case may stand as an obstacle to the accomplishment of the purposes and objectives of Congress. *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941). *See also Patten v. Lederle Laboratories,* 655 F.Supp. 745, 747 (D.Utah 1987); *Hurley,* 651 F.Supp. at 997.

In this case, defendant does not contend there has been express preemption. Rather, defendant contends that congressional intent to occupy the field of safety regulation in drug design, testing, and labeling should be implied from the pervasive scheme of the regulations the Food and Drug Administration (FDA) has promulgated pursuant to the authority granted under the Public Health Services Act (PHSA), 42 U.S.C. § 215 *et seq.* and the Federal Food, Drug and Cosmetic Act (FDCA), 21 U.S.C. § 301 *et seq.* Defendant further argues that an award of damages pursuant to state common law is "regulatory" in effect, and so must be deemed preempted. *See San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 247, 79 S.Ct. 773, 780, 3 L.Ed.2d 775

(1959).[3] In effect, defendant argues that it would be improper for a lay jury to decide issues delegated to the expertise of a federal agency, and that any recovery based on tort theories would be inconsistent with the experts' previous informed decisions.

This court recognizes that the FDA's regulations of prescription drugs is indeed far-reaching, if not pervasive. The DPT vaccine is a prescription biologic subject to the provisions of the FDCA and the PHSA and the regulations promulgated thereunder. The FDA regulations encompass the licensing, production, testing, distribution, labeling, review and approval of all drugs and biologicals. *See generally*, 21 C.F.R. §§ 211, 310 *et seq.*, 600 *et seq.* Each DPT manufacturer must be licensed, 21 C.F.R. § 601.1, and must submit detailed descriptions to the FDA which define the process used to manufacture the vaccine, 21 C.F.R. § 601.2. The FDA must then review and approve the manufacturing process. 21 C.F.R. § 601.25. The FDA also issues an "establishment license" by conducting inspections of the manufacturers' facilities and prescribing certain personnel qualifications. 21 C.F.R. §§ 600.20, 211, subpart B. Specific tests are required for each batch of vaccine, the results of which must be submitted to the FDA for review. 21 C.F.R. §§ 610.1, 610.2. Further, the pertussis element of DPT can be produced only in conformity with 21 C.F.R. §§ 620.1–620.7. As to the "label" or "package insert", the FDA requires that the following information must be provided for a pharmaceutical product: (1) the composition of the product; (2) the product's administration schedule; (3) when the product's usage is indicated and contraindicated; and (4) the product's potential adverse reactions which have been associated with the product's use. 21 C.F.R. §§ 610.60–610.65. The language used is subject to FDA approval, 21 C.F.R. §§ 1, 201; 50 Fed.Reg. 51108 (1985), and, once approved, the language cannot be changed without FDA approval; 21 C.F.R. § 601.12.[4] Further, most states, including Kansas, require a child to be vaccinated with DPT prior to entering public school. *See* K.S.A. 72–5209.

The Supreme Court has held that federal regulations have "no less preemptive effect than federal statutes." *Fidelity Federal Savings & Loan Assn v. De La Cuesta*, 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982). Thus, if the administrator promulgates regulations intended to preempt state law, a court's inquiry is limited and should "not disturb the agency's accommodation '*unless it appears from the statute or its legislative history that the accommodation is not one the Congress would have sanctioned.*'" *Patten v. Lederle Laboratories*, 655 F.Supp. at 747 (quoting *United States v. Shimer*, 367 U.S. 374, 381–82, 81

3. The *Garmon* decision involved federal regulation which, unlike the FDA at the time of Michelle Graham's injury, provided its own avenue for redress. This fact has caused at least one court to reject *Garmon* as authority that state tort remedies are "regulations". *See Palmer v. Liggett Group, Inc.*, 633 F.Supp. 1171, 1175 (D.Mass.1986) (relied on *Silkwood* for proposition that compensatory awards have indirect- and not regulatory-effect on defendants' behavior; "a lawsuit as the instant designed to compensate a victim of defendants' allegedly wrongful behavior, cannot be deemed a regulation ..."). *See also MacGillivray v. Lederle Laboratories*, —— F.Supp. ——, No. 85–0422–JB, slip op. (D.N.Mex. Feb. 5, 1987) (the state tort law at issue here is remedial and compensatory in nature; its purpose is not regulatory and does not directly conflict with any aspect of the federal regulatory scheme.... Nor would a state law damage claim necessarily frustrate the federal objectives behind the federal laws at issue here.... A tort judgment against a drug manufacturer may in fact accelerate the development of better, safer products.... Imposing a burden on the sale in the form of potential liability for defective design is distinguishable from a state seeking to exert actual control over the mode of manufacture or ditribution of a specific product."). This court need not reach the issue of whether tort remedies "regulate" however, as it finds no implied intent to preempt.

4. The regulations as to labeling do not specify mandatory wording, but are limited to the subject matter required. In *Muzatko v. International Playtex, Inc.*, —— F.Supp. ——, No. 85–C–1540 (E.D.Wis. May 14, 1987), the court stated "[b]ecause tampon manufacturers are permitted discretion with respect to drafting their warnings, the court does not believe that the contents of the warnings constitute a 'requirement' as that term was intended by Congress to be preempted." At ——.

S.Ct. 1554, 1559–60, 6 L.Ed.2d 908 (1961)) (emphasis added). It cannot be overemphasized that *only* Congress has the power to preempt state law. *Rice,* 331 U.S. at 230, 67 S.Ct. at 1152. "[T]he federal government does not always speak with one voice and it is the intent of Congress that determines the scope of the preempted field. In such situations, the pronouncements of Congress must control over contrary statements by administrators." *Patten,* 655 F.Supp. at 750.

In order to find congressional intent to preempt state tort remedies, this court would have to conclude that the federal regulations were promulgated with the intent to *exempt* drug manufacturers from tort liability. This court cannot find that such an intent is implicit in the regulatory scheme governing the manufacture and distribution of DPT. To the contrary, Congress has recently clarified its intent that regulations should *not* preempt state tort remedies for victims of vaccine-related injuries. Such intent was manifested in the "National Childhood Vaccine Injury Act", which will be more fully explained herein.

• Moreover, FDA regulations of prescription drugs are generally viewed as setting *minimum* standards, both as to design and warning. *See, e.g., Brochu v. Ortho Pharmaceutical Corp.,* 642 F.2d 652 (1st Cir. 1981); *Salmon v. Parke-Davis & Co.,* 520 F.2d 1359 (4th Cir.1975); *Griffin v. United States,* 500 F.2d 1059 (3d Cir.1974); *MacGillivray v. Lederle Laboratories,* 667 F.Supp. 743, 746 (D.N.Mex.1987); *Toner v. Lederle Laboratories,* 112 Idaho 328, 732 P.2d 297, 311 n. 12 (1987) ("FDA certification represents only the FDA's opinion, albeit an informed one, of the safety and efficacy of the drug. Regrettably, drugs occasionally prove not so safe as the FDA first believed."); *Wooderson v. Ortho Pharmaceutical Corp.,* 235 Kan. 387, 681 P.2d 1038, *cert. denied,* 469 U.S. 965, 105 S.Ct. 365, 83 L.Ed.2d 301 (1984); *Feldman v. Lederle Laboratories,* 97 N.J. 429, 479 A.2d 374 (1984); *Barson v. E.R. Squibb & Sons, Inc.,* 682 P.2d 832, 836 (Utah 1984); *Ferrigno v. Eli Lilly & Co.,* 175 N.J.Super. 551, 420 A.2d 1305 (1980); *Bristol-Myers v. Gonzales,* 548 S.W.2d 416 (Tex.Civ.App.

1976); *McEwen v. Ortho Pharmaceutical Corp.,* 270 Or. 375, 528 P.2d 522 (1974); *Stevens v. Parke-Davis & Co.,* 9 Cal.3d 51, 107 Cal.Rptr. 45, 53, 507 P.2d 653, 661 (1973).

FDA certification is evidence, but not conclusive evidence, of the drug manufacturer's reasonableness; the trier of fact may assign FDA approval the weight it deserves. *See O'Gilvie v. International Playtex, Inc.,* 821 F.2d 1438 (10th Cir.1987) (in affirming a jury instruction from this court that FDA standards regarding tampons' Toxic Shock Syndrome warnings are "minimal", the court stated, "[c]ompliance [with FDA standards] is not dispositive under Kansas law if the plaintiff shows that a reasonable manufacturer would have done more." Thus, before a court can conclude that federal regulations—which traditionally set minimum standards—have preempted the ability of states to protect their citizens through the judicial process, "courts should wait for a clear statement of congressional intent to work such an alteration." *Ferebee v. Chevron Chemical Co.,* 736 F.2d 1529, 1543 (D.C.Cir.), *cert. denied,* 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984).

As previously stated, Congress has recently clarified that by promulgating regulations regarding vaccines, state tort remedies *were not* intended to be preempted. On November 14, 1986, Congress enacted the National Childhood Vaccine Injury Act (NCVIA) which added a new title to the Public Health Service Act of November 14, 1986, Pub.L. No. 99–660, 100 Stat. 3743. The NCVIA establishes a program for vaccine research, requires—for the first time—the reporting to federal officials of injuries resulting from routine childhood vaccines, and sets up a program to compensate persons who sustain vaccine-related injuries or death. The NCVIA is intended to achieve optimal prevention of infectious diseases through immunization, while also achieving optimal prevention against adverse reactions to vaccines. Thus, the NCVIA is premised on Congress' recognition of the "potential hazards of … vac-

cines and ... the serious—and sometimes deadly—consequences they can have. This is particularly true with regard to the pertussis vaccine which is most commonly administered as part of a series of immunizations known as DPT...." H.Rep. No. 908, 99th Cong., 2d Sess., pt. 1 at 6 (1986), *reprinted in* 1986 U.S. Code Cong. & Admin. News 6287, 6344, 6347.

The legislative history clearly reveals that Congress began with the assumption that, in the absence of the NCVIA, state tort law has—and would continue—to apply:

> [F]or the relatively few who are injured by vaccines—through no fault of their own—the opportunities for redress and restitution are limited, time-consuming, expensive, and often unanswered. *Currently, vaccine-injured persons can seek recovery for their damages only through the civil tort system or through a settlement arrangement with the vaccine manufacturer.* Over time, neither approach has proven satisfactory. Lawsuits and settlement negotiations can take months and even years to complete. Transaction costs—including attorneys' fees and Court payments—are high. And in the end, no recovery may be available. Yet futures have been destroyed and mounting expenses must be met.
>
> This approach has also been ineffective for the manufacturers of childhood vaccines. *This has become especially true in more recent years as the number of lawsuits—particularly those concerning the DPT vaccine—has increased.*

*Id.* (emphasis added.) Thus, the House Committee acknowledged that damages may be recovered in a judicial setting notwithstanding the FDA's exclusive regulatory authority over drug design, testing and labeling. In fact, one of the main purposes of the NCVIA was to remedy the shortcomings of the traditional tort remedies.

Under the new act, vaccine injury victims are divided into three groups: (1) those injured by a vaccine administered more than eight years before the enactment; (2) those injured by a vaccine administered less than eight years before the enactment; and (3) those injured by a vaccine administered after the Act's enactment. The first group is not eligible under the NCVIA, but the Act makes "no changes from current law in such persons' legal rights or remedies." *Id.,* U.S. Code Cong. & Admin. News at 6354. The second group is eligible for compensation, but may instead choose to pursue a civil tort action. *Id.,* 1986 U.S. Code Cong. & Admin. News at 6355. The third group must complete the Act's compensation proceeding and reject its judgment before pursuing a civil action; however, a civil action is not foreclosed. *See Patten v. Lederle,* 655 F.Supp. at 749.

The NCVIA further evinces a congressional intent that civil tort actions were—and are—permissible despite compliance with the FDA regulations. (The defendant herein has argued that tort remedies may be pursued against a drug manufacturer only when there is evidence that regulations were violated.) Under the new act, there is a presumption that the vaccine contained proper direction and warning if the manufacturer complied with the applicable regulations. However, a plaintiff may overcome the presumption by clear and convincing evidence that the manufacturer failed to use due care despite its compliance. *Patten,* 655 F.Supp. at 749. The *Patten* court concluded that because "the act was intended to increase the barriers to recovery of damages, it is fair to assume that Congress believed that the presumption it created did not exist under pre-Act law." 655 F.Supp. at 749. In this regard, it was stated in the legislative history "the establishment of these standards are the only new requirements that affect State law regarding actions for vaccine-related injuries or death; all other aspects of State law remain unchanged." 1986 U.S. Code Cong. & Admin. News at 6366.

In sum, in enacting the NCVIA Congress *clearly* evidenced a willingness to allow state tort remedies for vaccine-related injuries, despite broad federal regulation, and despite the manufacturers' compliance therewith.

The defendant argues that the enactment of the NCVIA is just another indication of congressional intent to control *every* aspect of prescription biologics: "The national interest in regulating the production of these vital medicines is so complete that Congress recently passed a Bill which bars civil actions based on injuries allegedly associated with federally regulated and state mandated vaccines...." (Def.'s Memo. in Support of Motion for Summ. Judg. at 17.) In light of this court's previous discussion of the NCVIA, it is sufficient to state simply that defendant's argument is untenable.

Defendant also relies on the *Hurley* decision, previously cited, wherein the Eastern District Court of Texas found an implied congressional intent to preempt state tort actions. *Hurley* also involved the DPT vaccine. Defendant urges this court to find, as did the *Hurley* court, that: (1) the comprehensive nature of the FDA regulations evidences preemptive intent; (2) the nature of the DPT design and labeling relegates exclusive federal regulation in order to achieve uniformity vital to federal and national interests; and (3) state regulation (in the form of state tort remedies) would seriously and irreconcilably conflict with the federal statutory and regulatory scheme.

This court finds the *Hurley* decision unpersuasive for two reasons. First, and primarily, the Texas court did not refer to the NCVIA, and thus did not address or discuss Congress' clear statements found in the legislative history of that Act. Second, this court cannot agree that state tort remedies "conflict with" the regulatory scheme. While the *Hurley* court found that "a state common law determination that DPT design and manufacture is defective will seriously and irreconcilably conflict with the federal regulatory scheme and the national policies of immunization, adequate protection and supply of DPT" and "in effect will chill the efforts of the federal government to ensure that all U.S. children are immunized and frustrate Congress' intent in fostering such programs," 651 F.Supp. at 1006, this court believes to the contrary that by allowing a tort action such as this to proceed the national goal of optimum vaccine safety is actually enhanced. While Congress intends vaccines to be at least as uniformly safe as the FDA regulations require, there has never been a congressional intent that innocent victims of adverse reactions should be precluded from being compensated or from demonstrating that the vaccines could be even safer thereby encouraging additional efforts on the part of the vaccine manufacturers.[5] Uniformity is a goal to be achieved in the interest of more fully protecting citizens from unsafe products—it is *not* to be achieved by sacrificing public health. However, the *Hurley* court held that uniformity was the ultimate goal in any case, stating, "[t]his decision is not to be construed to mean necessarily that defendants' DPT vaccine is not defective in fact, or that defendants' actual method of production is free from scrutiny. The court's holding merely finds that federal law as to defendants' design and labeling of DPT preempts plaintiffs' state tort claims in this respect." Such a holding is, in effect, an abrogation of traditional tort law.

In addition to *Hurley*, defendant cites only two other cases where courts have found federal preemption of DPT vaccine victims' tort claims. *See Abbot v. American Cyanamid*, No. 86–857–A (E.D.Va. Mar. 9, 1987); and *Morris v. Parke-Davis & Co.*, No. 82–5296–RJK (C.D.Cal. Sept. 19, 1985) [Available on WESTLAW, DCT database]. However, the *Morris* court has since withdrawn its finding of preemption, and entered a new order finding no preemption. *Morris v. Parke-Davis & Co.*, 667 F.Supp. 1332 (C.D.Cal.1987). The majority of federal courts which have considered this issue have found there is no implied preemption of state tort remedies. *See Patten*, 655 F.Supp. 745 (thoroughly discusses the

---

**5.** The right to bring such lawsuits takes on added significance in view of the fact that most states, including Kansas and Missouri, require children to be immunized prior to attending public schools. The states have a great interest in compensating children who are victims of the vaccines and encouraging drug manufacturers to provide the safest possible vaccines.

NCVIA and finds it evidences congressional intent *not* to preempt); *Smith v. Wyeth Laboratories*, No. 84-2002 (S.D.W.Va. Aug. 21, 1986); *Jeski v. Connaught Laboratories*, No. A-84-CA-395, (W.D.Tex. Dec. 18, 1986); *Milam v. American Cyanamid*, No. 4-85-92-K (N.D.Tex. Oct. 15, 1986).

For the reasons stated, this court concludes that plaintiffs' claims are not preempted by federal law.

## II. The Application of Kansas Law

Defendant argues that under Kansas law as stated in *Johnson v. American Cyanamid*, 239 Kan. 279, 718 P.2d 1318 (1986), it is entitled to summary judgment as to each of plaintiffs' claims. Defendant argues that in cases involving prescription biologics, which by their nature are "unavoidably unsafe," the public policy of Kansas, as set forth in *Johnson*, requires that such products be immune from challenge in the courts for defects in design. Defendant further argues that, pursuant to *Johnson*, this court must find the warning adequate as a matter of law.

In *Johnson*, the plaintiff contracted polio after his young daughter received her polio vaccine. Although the manufacturer, defendant Lederle Laboratories, knew such a consequence was possible, the plaintiff was never warned of this possibility. The doctor, who was also a named defendant at the trial level, had been advised by Lederle as follows:

> Paralytic disease following the ingestion of live polio-virus vaccines has been reported ... in some instances, in persons who were in close contact with subjects who had been given live oral polio virus vaccine. Fortunately, such occurrences are rare....
>
> The estimated risk of vaccine-induced paralytic disease occurring in vaccinees or those in close contact with vaccinees is extremely low. A total of approximately 30 of such cases were reported for the 8 year period covering 1963 to 1970, during

which time 147,000,000 doses of the vaccine were distributed nationally.

239 Kan. at 288, 718 P.2d 1318.

The plaintiff brought an action in state court for design defect and failure to warn. The jury found no liability on the part of the plaintiff or the defendant doctor. The jury found defendant Lederle liable on all claims, awarding $2 million in actual damages and $8 million in punitives.

On appeal, the Kansas Supreme Court, in a 4-3 decision, reversed the verdict in its entirety, finding *no* liability on the part of Lederle. The court first discussed the history of the polio vaccine in some detail. As noted by the court, there are only two types of polio vaccines in existence—the Sabin vaccine and the Salk vaccine. The Sabin vaccine—which uses a live virus—was developed later than the "killed" Salk vaccine, and is the only type used in this country today. The court noted tht the Salk vaccine is somewhat less efficacious than the Sabin vaccine, and that "[v]irtually all of the Western world utilizes the Sabin vaccine over the Salk vaccine in its public health programs." 239 Kan. at 283, 718 P.2d 1318. Nevertheless, the plaintiff had contended that defendant Lederle was strictly liable for design defect by virtue of using the Sabin-type vaccine rather than the Salk-type vaccine.

In finding the defendant free from *strict liability* on the design defect claim, the Kansas court adopted comment k to Section 402A of the Restatement (Second) of Torts. Comment k provides:

> k. *Unavoidably unsafe products.* There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. An outstanding example is the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequences when it is injected. Since the disease invariably leads to a dreadful death, both the marketing and the use of the vaccine are fully justified, notwithstanding the unavoidably high degree of risk which

they involve. Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it *unreasonably* dangerous. The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to physicians, or under the prescription of a physician. It is also true in particular of many new or experimental drugs as to which, because of the lack of time and opportunity for sufficient medical experience, there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk. The seller of such products, again the qualification that they are properly prepared and marketed, and proper warning is given where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk.

The Kansas Supreme Court found that the Sabin-type polio vaccine is "unavoidably unsafe" and entitled to comment k immunity as a matter of law. The court noted that "[t]he remote risk of contact polio is inherent in the Sabin-type vaccine and cannot be eliminated," but that it is an "apparently useful and desirable product attended with a known but apparently reasonable risk." 239 Kan. at 285–86, 718 P.2d 1318. The court observed that "[t]he trial judge should have heard the evidence on the issue of [comment k's application] outside the presence of the jury and made the determination thereon." 239 Kan. at 286, 718 P.2d 1318.

Having concluded that as a matter of law the defendant could not be held strictly liable for a defect in design, the court reasoned "this leaves only the possible liability of the adequacy of the warning provided by the manufacturer." *Id.* In this regard, the court first observed the drug manufacturer's duty is "to adequately warn the physician of a known risk." *Id.* (citing

*Wooderson v. Ortho Pharmaceutical Corp.*, 235 Kan. 387, 681 P.2d 1038. Because the test used in determining warning issues is "reasonableness", the court reasoned that the plaintiff must show *negligence* on the part of the manufacturer. The court quoted at length from *Kearl v. Lederle Laboratories*, 172 Cal.App.3d 812, 218 Cal.Rptr. 453 (1985), in support of this proposition. In *Kearl*, the court found that "[j]ust as liability for failure to warn of product risk is based on negligence, the adequacy of a warning is also judged under a reasonableness standard...."

The *Johnson* court began its analysis of the warning by noting that the plaintiff's doctor had been warned of the precise "adverse reaction" from which plaintiff suffered: "This, then, is not a failure to warn question, but rather a question of the adequacy of the warning." 239 Kan. at 288, 718 P.2d 1318. The court then analyzed and rejected each of plaintiff's arguments for finding the warning inadequate. In effect, the court reweighed the evidence presented at trial. The court found that nothing in the warning was misstated ("plaintiff did not challenge [the risk figures given] directly"), or omitted ("the warning clearly states the scientific fact that some persons in close contact with vaccines may develop a paralytic disease from such contact. ... It hardly takes a medical degree to know that a person immune to the virus cannot acquire the disease."). *Id.* at 288, 289, 718 P.2d 1318. An additional factor which the court noted in finding the warning adequate was that "[t]he warning given ... had been approved by the Federal Drug Administration and was consistent with an overwhelming bulk of the current medical opinion." *Id.* at 289, 718 P.2d 1318. The court concluded that the warning was adequate as a matter of law, and that the trial court erred by failing to direct a verdict in defendant's behalf.

The dissent took issue with the majority's finding that the warning was adequate as a matter of law, challenging the court's right to reweigh evidence or pass on the

credibility of witnesses. 239 Kan. at 291–303, 718 P.2d 1318 (Prager, J., dissenting).

### A. Design Defect

The defendant argues that in *Johnson* the Kansas Supreme Court held that *any* prescription biological vaccine is "unavoidably unsafe" as a matter of law, and thus this court must find Wyeth free from liability for design defect. In this court's view, however, the *Johnson* decision is not—nor is it intended to be—so far reaching.

In *Johnson*, the Kansas Supreme Court adopted comment k to Restatement (Second) of Torts § 402A. Section 402A imposes *strict liability* on a product manufacturer "who sells any product in a defective condition unreasonably dangerous to the user...." Strict liability differs from negligence in that it obviates the need to show the manufacturer acted unreasonably, or, in other words, that he knew or should have known of the risk posed by the product. Strict liability in a products case focuses only on whether the product was defective, thereby imputing knowledge of the defect to the manufacturer.

Comment k recognizes that some products, such as certain drugs, are so beneficial and necessary that the manufacturer of these products should not, in all instances, be held strictly liable for unforeseeable harm. "Society wishes to encourage the manufacture of ethical drugs, and the research and development of new drugs. The imposition of strict liability would stifle these goals." Schwartz, *Unavoidably Unsafe Products: Clarifying the Meaning and Policy Behind Comment K*, 42 Wash. & Lee L.Rev. 1139, 1141 (1985). Under comment k, if the drug is shown to be "unavoidably unsafe" (i.e., highly beneficial, yet inherently and unavoidably risky), the manufacturer cannot be held strictly liable for design defect *unless* the vaccine is improperly manufactured or contains an inadequate warning. Neither comment k nor *Johnson* stands for the rule that *all* prescription drugs are unavoidably unsafe as a matter of law. *See Toner v. Lederle Laboratories*, 732 P.2d 297, 308 ("We do not believe comment k was intended to provide nor should it provide all ethical drugs with blanket immunity from design defect claims.... [N]ot all drugs are so perfectly designed that they cannot be made more pure or more safe, or that there are not safer, suitable alternatives."); *contra Morris v. Parke-Davis & Co.*, No. 82–5296 (C.D.Calif. Sept. 19, 1985) [Available on WESTLAW, DCT database]. *Johnson* addressed only the Sabin-type polio vaccine, finding that particular vaccine to be unavoidably unsafe. In doing so, the court considered that while there was evidence of a somewhat safer alternative (the Salk-type vaccine), this alternative was not as efficacious. The court clearly recognized that whether or not the vaccine was "unavoidably unsafe" was an issue needing resolution ("[t]he trial judge should have heard the evidence on this issue outside the presence of the jury and made the determination thereon"), and not simply a tautology. Thus, the court did *not* find that drugs by definition are unavoidably unsafe.

The *Kearl* decision, cited with approval in *Johnson*, suggests the following approach in determining whether a given drug is unavoidably unsafe:

> In our view, the decision as to whether a drug, vaccine, or any other product triggers unavoidably dangerous product exemption from strict liability design defect analysis, poses a mixed question of law and fact and can be made only after evidence is first taken, out of the jury's presence, on the relevant factors to be considered. [Citations ommitted.] A trial court should take evidence as to: (1) whether, when distributed, [footnote omitted] the product was intended to confer an exceptionally important benefit that made its availability highly desirable; (2) whether the then-existing risk posed by the product both was "substantial" and "unavoidable"; and (3) whether the interest in availability (again measured as of the time of distribution) outweighs the interest in promoting enhanced accountability through strict liability design defect review. In determining the first aspect of the second factor (i.e., whether the risk posed was "sub-

stantial") a court should consider whether, at the time of distribution, the risk posed permanent or long-term disability (e.g., loss of body functions, organs, or death) as opposed to mere temporary or insignificant inconvenience (e.g., skin rash, minor allergic reaction, etc.). In determining the second aspect of the second factor (i.e., whether the risk posed was "unavoidable") a court should consider (i) whether the product was designed to minimize—to the extent scientifically knowable at the time it was distributed—the risk inherent in the product, and (ii) the availability—again, at the time of distribution—of any alternative product that would have as effectively accomplished the full intended purpose of the subject product.

218 Cal.Rptr. 453, 464. *See also, Toner v. Lederle Laboratories,* 732 P.2d 297, 305–09 ("Clearly, the comment contemplates a weighing of the benefit of the product against its risk ... the weighing must be done at the time the product is distributed to the plaintiff.... [T]he design must be as safe as the best available testing and research permits.... Knowledge of the product's risks based on reliable and obtainable information is imputed to the seller.").

 This court is convinced that such factors *must* be considered before a court can determine whether a given drug falls within comment k's protection. In this case, the issue cannot be resolved as a matter of law at the summary judgment stage. Although defendant contends the whole cell DPT vaccine posed an *unavoidable* risk of severe injury, this is hotly contested by plaintiffs. Plaintiffs have submitted the affidavit of one of their experts, a Dr. Zahalsky, who will testify that Wyeth had the capability to produce a safer vaccine. Plaintiffs claim that Wyeth's own records substantiate this contention. Accordingly, there is an issue of material fact as to whether the "unsafety" of the

DPT vaccine manufactured by Wyeth was unavoidable.

 Even if this court had concluded—or were eventually to conclude—that the vaccine is "unavoidably unsafe," the plaintiffs could still pursue their design defect claim under a negligence theory. Syllabus ¶ 1 to *Johnson* states:

> Although in standard products liability litigation plaintiff may utilize a strict liability design defect theory, such strict liability cause of action must be prohibited for public policy reasons where the product complained of is an unavoidably unsafe product within the purview of comment k to § 402A of Restatement (Second) of Torts (1963). *In such special circumstances, plaintiff may proceed on a design defect theory only on the basis of negligence.*

It is noteworthy that in the body of the opinion, *negligent* design defect is never mentioned or discussed, although this court understands it was a theory pursued at trial level. While the court is aware that Kansas is not a "syllabus state" (i.e., the body of the case, not the syllabus, controls in case of a conflict), the court is also aware that the Kansas Supreme Court justice who authors an opinion also writes its syllabus. Thus, while negligent design defect was not directly addressed in *Johnson,* there is at least limited authority—contained in the syllabus—that finding a drug to be "unavoidably unsafe" does not preclude the jury from considering the manufacturer's reasonableness. Quite clearly, by comment k's own terms, the comment bars only strict liability claims—i.e., that the product was "defective" and "unreasonably dangerous." Specifically, the comment states that the manufacturer of an "unavoidably unsafe" product is not to be held to *strict liability....*" (Emphasis added.) The cases which have addressed the issue are in agreement that even though a product is deemed "unavoidably unsafe," the plaintiff may proceed under a negligence cause of action. *Toner,* 732 P.2d at 310,[6] *Kearl,* 218 Cal.Rptr. at 465;

---

**6.** The Idaho Supreme Court heard the *Toner* case on questions certified from the Ninth Circuit Court of Appeals, including: *Under Idaho* law, do the principles set forth in Restatement (Second) of Torts § 402A comment k, apply to strict liability and negligence claims, and in

*Feldman v. Lederle Laboratories,* 479 A.2d 374, 381; *Stone v. Smith, Kline & French Laboratories,* 447 So.2d 1301, 1303 (Ala.1984). Accordingly, this court must conclude that comment k's application does *not* shield the seller of a product from negligence claims. Such a result fits within the policy of comment k—i.e., by denying plaintiffs recovery based on finding the manufacturer strictly liable if the drug is dangerous, and requiring the plaintiff to prove *negligence,* the policy of encouraging the production and marketing of safe, useful products is furthered.

Of course, the inquiry into whether a manufacturer acted negligently is, in a general sense, similar to the comment k inquiry of whether a drug is unavoidably unsafe. *Toner,* 732 P.2d at 310; *Feldman,* 479 A.2d at 385–86. Thus, in a case such as this where both theories (strict liability and negligence) are asserted, the evidence from which the court must determine if the product is unavoidably unsafe need *not* be heard outside the presence of the jury as it will be the *same* evidence from which the jury will determine negligence.

### B. Adequacy of Warning

■ Even if the evidence in this case shows that Wyeth used the best available vaccine and the product was "unavoidably unsafe," it will not be entitled to comment k immunity if it did not provide an adequate warning.[7] *Johnson,* 239 Kan. at 286, 718 P.2d 1318; *see also Brochu v. Ortho Pharmaceutical Corp.,* 642 F.2d 652, 657 (1st Cir.1981); *Reyes v. Wyeth Laboratories,* 498 F.2d 1264, 1276 (5th Cir.), *cert.*

*denied,* 419 U.S. 1096, 95 S.Ct. 687, 42 L.Ed.2d 688 (1974); *Davis v. Wyeth Laboratories, Inc.,* 399 F.2d 121, 128–29 (9th Cir.1968); *Yarrow v. Sterling Drug, Inc.,* 263 F.Supp. 159, 163 (D.S.D.1967), *aff'd,* 408 F.2d 978 (8th Cir.1969); *Toner v. Lederle,* 732 P.2d at 305; *Kearl,* 218 Cal.Rptr. 465. The comment thus recognizes that while some products are inherently dangerous, the user has a right to know of these inherent risks so that he can make an informed decision; in the absence of such warning, the product is deemed to be defective.

An adequate warning is one that is reasonable under the circumstances. *Wooderson v. Ortho Pharmaceutical Corp.,* 235 Kan. 387, 400, 681 P.2d 1038. A warning may be inadequate in factual content, the expression of facts, or in the method by which it is conveyed. *Id.* In the case of mass innoculations, vaccinees must be informed,[8] in clear and simple terms, by the manufacturer of: (1) the reasonably foreseeable risk inherent in the product; (2) reasonable available alternative products (if any) and the reasonably foreseeable risks posed by such alternatives; and, in appropriate cases, (3) the reasonably foreseeable results of remaining untreated. *See Johnson,* 239 Kan. at 292, 718 P.2d 1318 (Prager, J., dissenting); *Unthank v. United States,* 732 F.2d 1517, 1521 (10th Cir.1984). The manufacturer's duty is to warn of all potential dangers which it knew, or in the exercise of reasonable care should have known, to exist. This duty is a continuous one, requiring the manufacturer to keep abreast of the current state of

particular to the claims in this suit? 779 F.2d 1433. Thus, the Idaho court's finding that comment k does not preclude the assertion of a claim for negligent design defect is-in effect-the law of the Ninth Circuit.

7. Because Mrs. Graham was warned that brain damage could result from the vaccine, the issue before the court is not *failure* to warn, but rather, *adequacy* of the warning. *See Johnson,* 239 Kan. at 288, 718 P.2d 1318.

8. Generally, in the case of prescription drugs, the manufacturer's duty is to adequately warn the physician of known risks. *Johnson,* 239 Kan. at 286. This is known as the "learned intermediary" rule. However, there is authority that when a vaccine is dispensed at a clinic without close supervision by a physician, the manufacturer's duty to warn extends to the vaccinee. In *Johnson,* the vaccine was administered by a doctor, and the court found that "under such circumstances" the learned intermediary rule applied. In the case at bar, the vaccine was administered by a nurse at a clinic. However, the plaintiffs herein seem to assume the learned intermediary doctrine applies.

In any event, a manufacturer is directly liable to the patient when the warning to the "learned intermediary" is inadequate. *Wooderson,* 235 Kan. at 400, 681 P.2d 1038.

knowledge. *Wooderson,* 235 Kan. at 405, 681 P.2d 1038.

■ To impose liability on the defendant for inadequate warning, the plaintiff must show *negligence* on the part of the manufacturer. *Johnson,* 239 Kan. at 286, 718 P.2d 1318. Accordingly, plaintiffs are precluded from asserting a claim of strict liability for failure to warn and summary judgment will be entered for defendant on that claim.

■ Defendant argues that the warning given was adequate as a matter of law. In this regard, defendant urges the court to find that *Johnson* is directly on point and *requires* a finding of adequate warning. This court cannot agree.

*Johnson* must necessarily be limited to its facts on the warning issue. As previously stated, the adequacy of a warning turns on its reasonableness *under the circumstances.* The *Johnson* court found that under the circumstances before it, reasonable minds could not differ on the adequacy of the warning. *Johnson* does nothing to change the factual nature of the inquiry.

It is well established in Kansas that whether a warning is adequate is an issue for the trier of fact. *Wooderson,* 235 Kan. at 409, 681 P.2d 1038. Moreover, the testimony of experts in the field should be considered. *Siruta v. Hesston Corp.,* 232 Kan. 654, 659 P.2d 799 (1983).

In this case the plaintiffs will offer evidence that the warning misstated the statistical incidence of severe reactions, failed to adequately identify the level of endotoxin in each vial or lot, and failed to state that persons with a family or personal history of seizures or central nervous system disorders should forego immunization and seek further medical evaluation prior to vaccination. Although defendant adamantly challenges these allegations, these are clearly issues which must be resolved by the trier of fact.

Defendant further argues that the court should find it non-negligent *per se* as the warning given had been approved by the FDA. However, as previously stated, FDA standards are *minimum* standards. While the FDA's approval is a factor to be considered by the jury, it does not establish non-negligence *per se.* The *Johnson* decision is not to the contrary: the FDA's approval of the warning was only one of the several factors it considered in finding the warning adequate as a matter of law.

Finally, the defendant argues that this court must grant summary judgment on the warning claim because the inadequacy of the warning was not the proximate cause of Michelle Graham's injuries. In this regard, defendant asserts that Mrs. Graham based her decision to have her baby immunized *solely* on the nurse's remarks indicating that she had no other choice.

However, the defendant's argument fails to recognize the rule that if a jury finds a warning inadequate, causation is presumed. *Wooderson,* 235 Kan. at 410, 681 P.2d 1038. In other words, it is presumed that an adequate warning would be heeded by the patient. *Id.* Thus, in this case, if an adequate warning had been given (assuming arguendo that the one given was inadequate), it is possible the nurse would have not said the things she did, or perhaps would have suggested alternatives. This, though, is a matter of pure speculation; hence, the presumption.

The defendant argues the fact that Mrs. Graham initially hesitated because of her concern with adverse reactions proves the warning she received was adequate. This—again—is entirely speculative. While such evidence is certainly admissible, it does not require a finding that the warning was adequate as a matter of law. In fact, it begs the question of whether Mrs. Graham would have consented to the vaccine if the warning had contained all that plaintiffs contend it should have.

Accordingly, the issue of the warning's adequacy is factual and must be resolved by the trier of fact.

*C. Breach of Warranty and Misrepresentation*

■ Because the court does not grant summary judgment on the plaintiffs' tort

# 1500

claims, the warranty claims—at this point—are merely superfluous. As such, the court will deny defendant's motion for summary judgment as to these claims for the same reasons set forth above. In doing so, the court notes that by filing this lawsuit the defendant was given sufficient notice, under K.S.A. 84-2-607, of the alleged breach of warranty. *See Owens v. Glendale Optical Co.*, 590 F.Supp. 32 (S.D. Ill.1984); *Palmer v. A.H. Robins Co., Inc.*, 684 P.2d 187 (Colo.1984); *Goldstein v. G.D. Searle & Co.*, 62 Ill.App.3d 344, 19 Ill.Dec. 208, 218, 378 N.E.2d 1083, 1089 (1978).

As to the misrepresentation claim, the defendant argues only that plaintiffs are unable—as a matter of law—to show *reliance.* As previously discussed with regard to the adequacy of the warning, it is presumed that additional warnings (or representations) would have been heeded. Thus, the defendant's argument is without merit.

### III. Conclusion

Vaccines such as the DPT vaccine play an important and critical role in this society. Millions of lives are saved. However, some innocent people—such as Michelle Graham—are grievously injured by these vaccines. The defendant has argued that the doctrine of federal preemption precludes victims from seeking compensation from the vaccine manufacturers. However, this court finds that Congress did not intend to preclude vaccine victims from bringing state tort lawsuits. The fact that the vaccine manufacturer complied with FDA regulations is evidence that should be considered by a jury; however, these regulations set minimum standards. Manufacturers are *not* precluded from taking steps to improve their vaccine, or to better inform as to its dangerous propensities. In this case, the evidence must be heard before it can be determined that the whole cell vaccine was the safest and most efficacious available—in other words, that it was "unavoidably unsafe." And in any case, the adequacy of the warning is an issue for the trier of fact. Thus, this court will not rule that as a matter of law Michelle Graham will be denied any recourse. This case will proceed to trial.

IT IS ACCORDINGLY ORDERED this 21 day of July, 1987, that defendant's motion for summary judgment is granted as to plaintiffs' claim of strict liability for failure to warn, and is denied as to all remaining claims.

### ORDER NUNC PRO TUNC

In its Memorandum and Order of July 21, 1987, denying defendant's motion for summary judgment, the court applied the law of the State of Kansas. This was done due to the parties' stipulation, contained in the pretrial order, that the law of Kansas would apply, even though the infant plaintiff received her vaccination in the State of Missouri.