52 F.3d 337
 NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 CANNON INDUSTRIES, INC., a Utah corporation,
Plaintiff-Appellee/Cross-Appellant,
v.
ARMCO STEEL COMPANY, a Delaware limited partnership; and AK
MANAGEMENT CORPORATION, an Ohio corporation and the
corporate general partner of Armco Steel Company,
Defendants-appellants/Cross-Appellees.
 Nos. 93-4208, 93-4221.
 United States Court of Appeals, Tenth Circuit.
 April 4, 1995.
 
 Before MOORE, BRIGHT,* and BALDOCK, Circuit Judges.
 ORDER AND JUDGMENT**
 Myron H. Bright, Senior Circuit Judge.
 
 
 1
 Cannon Industries, Inc. ("Cannon") brought an action seeking damages against Armco Steel Company and its AK Management Company (collectively referred to as "Armco") for breach of contract (Count I) and/or quantum meruit (Count II, contract implied-in-law/unjust enrichment) based on Armco's alleged unauthorized use of Cannon's technology and know-how to improve and modify specialized molds used by Armco in its steel mill foundry located near Ashland, Kentucky. A jury awarded Cannon $1,395,660 on the claim of unjust enrichment, the only claim submitted, and the trial court entered judgment for Cannon on the verdict and prejudgment interest, totalling $1,767,323.64, plus post-judgment interest. Armco appeals from the judgment and the trial court's order denying Armco's motion for a new trial or a remittitur in the award.
 
 Armco raises three issues on appeal:
 
 2
 1. Whether the trial court erred in permitting Cannon, only two weeks prior to the trial date, to assert an increased damage claim from Armco's estimate of $180,000 (the ad damnun demand on quantum meruit being $698,411.98) to $6.9 million for an alleged benefit received by Armco from the Cannon mold technology and thereafter refusing a continuance of the trial?
 
 
 3
 2. Whether the trial court erred in excluding newly discovered evidence that the Cannon technology originated with the Kubota Corporation ("Kubota") of Osaka, Japan, and that Cannon's concealment of this information from Armco during discovery and the trial allowed Cannon to benefit from Kubota's technology at the expense of Armco?
 
 
 4
 3. Whether the trial court erred in denying Armco a new trial on the basis of newly discovered evidence that the Cannon technology had been misappropriated by Cannon from Kubota?
 
 
 5
 The parties agree that we review these issues of trial court error under an abuse of discretion standard. On review of the record, the briefs, and oral arguments, we conclude that adequate grounds existed for the trial court's rulings here in question and the trial court did not abuse its discretion in deciding the issues against Armco. Accordingly, we affirm.
 
 I. BACKGROUND
 
 6
 The complaint asserts that between August 28, 1989 and November 21, 1990 Cannon and Armco entered into an arrangement to test the technology and know-how provided by Cannon in contemplation of a joint venture between the parties. This technology proposed to extend the life of ingot molds utilized by Armco in their steel ingot production of rolled steel and other steel products derived from ingots. Using this technology provided by Cannon, the Armco molds underwent a redesign. In the summer of 1990, during the test period, Armco used these new molds and realized a production cost savings of almost $120,000. Armco paid Cannon one-half of that amount for its services. Cannon and Armco then began negotiations of a joint venture utilizing the Cannon technology, but the plan failed when Armco, in November 1990, made the decision to convert its foundry method of producing steel from ingot molds to 100% continuous cast products. After the test run and during the negotiation period, Armco continued producing ingot molds, utilizing the Cannon mold technology without Cannon's knowledge, consent or payment for its use. Armco's foundry operation shut down in late 1990.
 
 
 7
 Armco used the additional molds it produced based on the Cannon technology to make steel ingots which were then manufactured into steel products; the first intermediate product being "hot rolled strips" as a marketable product. Cannon asserted that Armco produced over 54,000 tons of steel ingots using new and unauthorized molds constructed from Cannon's technology for which Cannon received no payment and Armco received a benefit. Cannon brought its suit for damages in January 1991.
 
 
 8
 Extensive discovery followed. Armco assumed, based on the cost savings to Armco through extended mold life during the test phase, that Cannon's benefit did not exceed $180,000. Cannon did not agree and claimed that its benefit depended on production and price figures to be provided by Armco and then calculated by Cannon's experts as to benefits Armco allegedly received. Cannon asserts that it did not and could not calculate benefit figures until it learned about Armco's profit of 25% in its production capacity attributed to Cannon molds. Thereafter Cannon calculated the profit and benefit amounts based not on ingots manufactured but on the assumed profit margin Armco received by selling the hot rolled strip steel, manufactured from ingots. Additionally, Cannon states that its expert witness in a deposition given a year before trial had estimated several millions of dollars in benefits for Armco. To the contrary, Armco, in essence, contends that it had earlier furnished Cannon with necessary figures for Cannon to present any increased claim for benefits, and that Cannon "laid in the weeds" and unfairly surprised Armco with this inflated damage estimate only two weeks before the trial date, which trial had been calendared by the court several months earlier.
 
 
 9
 Armco asserts that when faced with this new multimillion dollar claim, it requested a new review of the case and that its expert, in reviewing information on mold technology, discovered that Cannon had not developed new technology. But, in fact, Cannon's employees, who had worked for another steel mold consulting firm (Valley Vulcan Mold Company), had wrongly acquired this information from Kubota in violation of a confidentiality agreement with Kubota and Valley Vulcan Mold Company. Armco then contacted Kubota in Japan and confirmed its suspicions about misappropriation of Kubota's trade secrets and arranged for Kubota's employee, Mr. Takashiro of Japan, to come to Salt Lake City, the location of the trial. Armco called for the testimony of Mr. Takashiro on the third day of trial. The trial court declined to allow this new witness to testify because this surprise witness had not been included in the pretrial order.
 
 
 10
 Post trial, Armco sought a new trial based on Mr. Takashiro's affidavit and other evidence. Cannon introduced evidence in opposition. The district court denied Armco's request for a new trial.
 
 
 11
 We turn to a brief discussion of the issues on appeal.
 
 II. DISCUSSION
 A. Refusal to Grant a Continuance
 
 12
 The record discloses that the district court acted within its discretion in rejecting the continuance. See SIL-FLO, Inc. v. SFHC, Inc., 917 F.2d 1507, 1514 (10th Cir.1990).
 
 
 13
 At the district court's hearing on July 22, 1993, on the motion to vacate the trial setting of August 2, the district court denied the motion, noting that a date certain for trial would be lost by the court and the parties and the case could not be tried for a very long time. The trial judge observed on the alleged new theory of damages as claimed by Armco:
 
 
 14
 And, moreover, in reading these answers to [prior] interrogatories, they are certainly not conclusive as far as I can tell about any theory that the plaintiff has embraced and that would positively cause the opposing side to feel like they could be confident that some amount is stated in here that the defendants could rely on. And the plaintiffs cite this language too from the answers to interrogatories that really refers to the very thing they're contending now.
 
 
 15
 So, I don't--tentatively I think the defendants have just got to go ahead and get prepared and be here on the 2nd.
 
 
 16
 (Appendix at 0907).
 
 
 17
 The colloquy between the district court and Armco's counsel continued:
 
 
 18
 [Mr. Hanni (Armco's attorney) ]: Now on the date of the pretrial, for the very first time, the plaintiff comes up with a totally different theory. They have abandoned the savings approach by the extended mold life; that is, Armco's molds would take so many pours and the Cannon molds would take so many more pours of ingot steel.
 
 
 19
 The Court: Well, what do they say, Mr. Hanni? I don't want to interrupt you, but where is it in these answers to interrogatories--and I've got them right in front of me--where do they embrace unequivocally any theory that anyone could have relied on in reading these things, or any amount? I can't see it.
 
 
 20
 You know, they bounce around quite a bit, and there are five or six, it seems to me, interrogatories that ask again and again what they're relying on, but I can't see anything in here that if I were in the position of the defendant and I got these answers that I would say, "Look, I'm confident that they're not going to ask for any more than 515,000 or a million dollars or any other amount." It's just not here.
 
 
 21
 (Appendix at 0908-09).
 
 
 22
 The trial court then ordered that Cannon's counsel make its witnesses available to Armco for further discovery before trial. Plaintiff's counsel agreed to do so and stated to the trial court:
 
 
 23
 Mr. Peck [Cannon's attorney]: A very interesting point was is in the pretrial order they disclosed to us the first time that they; said--they came back and said, "25 percent of our ingot production of this particular size was attributable to your technology"--at least that's what we see that they've said to us. The next day we made the calculations and provided them the information.
 
 
 24
 We asked their people in depositions, "do you admit you received a benefit?"
 
 
 25
 "Yes."
 
 
 26
 "How much is it and how would you calculate it?"
 
 
 27
 "I don't know. I don't know. I don't know."
 
 
 28
 (Appendix at 0911-12).
 
 
 29
 Counsel for Armco then argued the invalidity of the benefit figures submitted by Cannon. Mr. Peck, counsel for Cannon, further explained the calculations underlying the $6.9 million revised claim. The district court then observed that while Armco did not receive a detailed computation on the benefit claim in February of 1993, it did not seek additional data until the pretrial conference on July 15, 1993.
 
 
 30
 The district court then directed that Cannon furnish full damage information to Armco by the next Tuesday (July 27). Counsel for Armco, Mr. Hanni, voiced no further objection.[1] The transcript relates the following:
 
 
 31
 [The Court:] I'm not expecting them to give you a transcript of what they're going to present, but you're going to be entitled to know by next Tuesday at 4:00 p.m. what you've just referred to.
 
 
 32
 Mr. Hanni [Armco's attorney]: We need to know the witnesses; we need to know every document they're going to rely on on that--on this $600,000 claim that they talk about here in the court today.
 
 
 33
 The Court: You're going to get it.
 
 
 34
 Mr. Hanni: I have no idea how they come up with that. I need to know that. How do they calculate it? What do they base it on? And who are the witnesses that are going to testify about that? And what are the documents that they're going to rely on?
 
 
 35
 The Court: You're going to get it.
 
 
 36
 Mr. Hanni: And if they're going to go in on any other quantum--benefit theory, quantum meruit theory, we need to know how much do you claim? Who are the witnesses that you're going to rely on? And give us every document that you intend to rely on.
 
 
 37
 The Court: They're going to give that to you by next Tuesday at 4:00 p.m.
 
 
 38
 Mr. Hanni: Is there any way we can move that up a little, Your Honor?
 
 
 39
 The Court: Gee, Mr. Hanni, it's Thursday afternoon now, and we've got a holiday in the meantime.
 
 
 40
 Mr. Hanni: That's true.
 
 
 41
 The Court: So really they're looking at tomorrow and Monday to do a thorough job of getting you this. If you want to take Mr. Storey's deposition next week, you can do that.
 
 
 42
 Mr. Hanni: What about Mr. Winner? He's going to be the one that comes to trial and puts all this together.
 
 
 43
 Mr. Peck: Mr. Storey will be there also.
 
 
 44
 Mr. Hanni: But Mr. Winner, he's one of their chief people that has put this together, their chief witness, Your Honor.
 
 
 45
 The Court: Well, you can fly back to Ohio next Thursday and take Mr. Winner's deposition.
 
 
 46
 Mr. Hanni: Okay.
 
 
 47
 The Court: Okay. Thank you, counsel, very much.
 
 
 48
 (Appendix at 0923-24).
 
 
 49
 The trial court's exercise of judicial judgment seems proper and fair given the record on discovery matters and considering the statements of counsel for each party.
 
 
 50
 Moreover, Armco does not complain that it did not receive the information ordered disclosed by the trial judge. The allegation of abuse of discretion in refusing to vacate the trial setting is without any substantial merit.
 
 B. Exclusion of Evidence
 
 51
 Armco's claim that the trial court erred in excluding newly discovered evidence and Armco's further claim that the trial court abused its discretion in denying a new trial on this newly discovered evidence emanating from Kubota are two sides of the same coin.
 
 
 52
 As we have observed, Armco offered the testimony of Kubota's representative, Mr. Masata Takashiro, on the third day of trial. The trial court rejected the testimony and the new defense as not within the issues or witnesses covered by the pretrial order.
 
 
 53
 Armco, as its excuse for the lateness of the evidence, asserts that the increase in claimed damages by Cannon justified an emergency effort to defend the claim, even to the extent of obtaining a witness from as far away as Japan. The trial court responded:
 
 
 54
 The Court: Well, all they changed, Mr. Hanni, they--and this is substantial--but they went from one million to seven million. But it's just a change in the manner in which they computed.
 
 
 55
 It seems to me it's just as relevant to resisting the one million claim as resisting the seven million claim that this is in the public domain and is Kubota's--Kubota came up with it and gave some tutelage to Eisenbrei [Cannon employee].
 
 
 56
 I mean it isn't like the springing of that large claim suddenly injects Kubota in. They're just as involved, except for your exposure, in the one million as the seven million.
 
 
 57
 (Appendix at 1333-34).
 
 
 58
 Clearly the trial judge, as a discretionary matter, properly rejected this surprise trial evidence.
 
 C. Newly Discovered Evidence
 
 59
 The trial court properly rejected the motion for new trial on newly discovered evidence. Armco knew that Cannon's employees at an earlier time had worked with Kubota personnel on mold technology. Cannon's employees denied any taking of new technology from Kubota. Armco might have followed up on this possibility at any time after February 1993, many months before trial. Armco's failure to act diligently cannot be charged to anyone but itself. See Graham v. Wyeth Laboratories, 906 F.2d 1399, 1416 (10th Cir.), cert. denied, 498 U.S. 981 (1990). At that time Armco faced one claim over a million dollars on Count I. It will not avail for Armco to contend that, in its view, the lawsuit did not justify further inquiry.
 
 
 60
 Further, as disclosed by responses to the new trial motion, Cannon's personnel vigorously denied misappropriation of any trade secrets. Finally, Armco accepted the technology from Cannon and benefited therefrom without investigating whether Cannon solely developed this technology, rather than some other organization. In our view, the record shows little support for a denial of damages on the basis that Armco received Kubota technology, not Cannon's. After all, Armco essentially had conceded a benefit to it but would attempt to assert an "unclean hands doctrine" to obtain a new trial on an issue never before presented by Armco in the two and one-half years of litigation. The district court acted within its discretion in refusing to listen to or reopen this lengthy litigation upon an entirely new issue sprung by Armco in the middle of the trial.
 
 III. CONCLUSION
 
 61
 Accordingly, the judgment stands AFFIRMED.[2]
 
 
 
 *
 The Honorable Myron H. Bright, Senior Circuit Judge for the United States Court of Appeals for the Eighth Circuit, sitting by designation
 
 
 **
 This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of the court's General Order filed November 29, 1993. 151 F.R.D. 470
 
 
 [1]
 The claim of error, notwithstanding no additional objection, was preserved
 
 
 [2]
 Cannon has abandoned the cross-appeal no. 93-4221 and it is dismissed